## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT PENNSYLVANIA

| | | |
|---|---|---|
| HOBBS & TOWNE CAPITAL III, LLC, | : | Civil Action No. _____ |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| GADGET SOFTWARE, INC., | : | |
| DAN CRAIN, RABINDRA SONI, | : | |
| and MAXWELL RIGGSBEE, JR., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>COMPLAINT</u>

Plaintiff Hobbs & Towne Capital III, LLC, by and through its undersigned counsel, hereby files this complaint against Defendant Gadget Software, Inc. and its founders/officers, Dan Crain, Rabindra Soni and Maxwell Riggsbee, Jr. in their individual capacities, and alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Hobbs & Towne Capital III, LLC ("HTC") brings this action to recover the $570,000 it invested into Defendant Gadget Software, Inc. ("Gadget") in exchange for 2,749,639 shares of Series A Preferred stock and 2,749,639 shares of Common stock in Gadget. HTC's decision to invest was made in strict reliance upon numerous material misrepresentations made by Gadget by and through its founders/officers, Dan Crain, Rabindra Soni and Maxwell Risgbee, Jr. (hereinafter collectively referred to as "the Individual Defendants") in solicitation meetings and private offering materials issued by them regarding the proposed investment in their software company.  Specifically, during the Fall of 2017, Gadget and the Individual Defendants represented that Gadget's software product was already on the market; that it had

secured several specific and significant customer contracts, and had numerous other customers "in the pipeline"; that Gadget had already secured $10 million in funding; and that HTC's money would be used for sales and engineering and not existing debts.  The Individual Defendants further represented that because they would soon be opening up the Series B round of funding, their Series A investment would significantly increase in value.

Over time, it became clear that these representations were—as one Defendant admitted— lies.  Gadget's product was not market-ready; Gadget had not secured, nor was it close to securing, contracts with any customers; HTC's funds were intended and needed to pay for outstanding payroll tax liabilities, not sales or engineering; and Defendants had only secured $8 million in initial funding.

Based on these misrepresentations, HTC asserts claims for violations of Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, et seq., and Rule 10b-5(a) promulgated thereunder by the Securities Exchange Commission, 17 C.F.R. § 240.10b5; violations of the Pennsylvania Securities Act of 1972 ("Pennsylvania Securities Act"), 70 Pa. Stat. Ann. §§ 1-101, et seq.; and common law fraud, negligent misrepresentation, and breach of contract.

## PARTIES

2.     Plaintiff HTC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 1288 Valley Forge Road, Suite 91, Valley Forge, Pennsylvania 19482.

3.     Defendant Gadget is a Delaware corporation with its principal place of business at 58 Park Place, Second Floor, Newark, New Jersey 07102.

5210106v4

4.      Defendant Dan Crain ("Crain") is an individual who, upon information and belief, resides at 33 Van Blarcom Lane, Wycoff, NJ 07481.  Crain is a co-founder and past CEO of Gadget.

5.      Defendant Rabindra Soni ("Soni") is an individual who, upon information and belief, resides at 101 Pickney Street, Boston, MA 02114.  Soni is a co-founder and, upon information and belief, the current CEO and Executive Chairman of the Board of Gadget.

6.      Defendant Maxwell Riggsbee, Jr. ("Riggsbee") is an individual who, upon information and belief, resides at 160 Summit Street, Englewood, NJ 07631.  Riggsbee is a co-founder and, upon information and belief, the current Chief Product Officer of Gadget.

## JURISDICTION AND VENUE

7.      Jurisdiction exists by virtue of a federal question pursuant to 28 U.S.C. § 1331 because certain of these claims involve violations of the Securities Exchange Act of 1934 ("Exchange Act").  The court has jurisdiction over the remaining state law claims by virtue of supplemental jurisdiction.  28 USC § 1367.

8.      Venue is proper in this judicial district under 28 USC § 1391, as it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

9.      As alleged in greater detail below, Gadget and the Individual Defendants solicited an investment from HTC by misleading and fraudulent means and caused damage to HTC within this judicial district.

## FACTS

10.     Gadget is a software development company that is in the process of developing a new mobile device software technology.  The new product will purportedly be able to transform PDF documents into a more user-friendly, interactive format.  The technology will also

supposedly offer a new medium for publishing the reformatted data on mobile devices, allowing others to view the content from their own mobile devices.

11.     In order to fund this project, Defendants issued and sold security interests in the company to various investors including Plaintiff through private placements, under Rule 506(b) of Regulation D, a "safe harbor" under Section 4(a)(2) of the Securities Act of 1933.

12.     HTC was introduced to Gadget through Defendant Rabindra Soni, Gadget's then Chairman of the Board, in the summer of 2017, when Soni told Andrew Towne, one of HTC's managing members, that HTC had a unique opportunity to get into a tech deal with big potential. Defendant Soni said that he had invested in the same management team of Defendants Crain and Riggsbee twice before and both ventures were very successful.  Defendant Soni told Towne that he would instruct Defendant Crain, Gadget's CEO, to open up the "Series A" investment round to get HTC the same terms as other Series A investors who had purchased stock the prior fall.

13.     In September 2017, Defendant Crain solicited HTC's Towne by telephone to invest in Gadget's software business.

14.     On September 27, 2017, HTC executed and returned to Gadget the Non-Disclosure Agreement required by Gadget to disclose the proposed investment details.

15.     At that time, Crain represented to Towne that Gadget had recently closed a Series A investment round, but that it would reopen the round to permit HTC to invest under the same terms if it did so promptly.

16.     Defendants Crain, Soni and Riggsbee hosted several telephone conferences with HTC to extoll the capabilities of its software for use in a mobile environment, to inform of Gadget's penetration into the relevant markets and to solicit HTC to invest in Gadget.

5210106v4

17.     On October 2, 2017, HTC members Andy Towne, John McInerney and Wes Goldstein participated in a video-conference with Defendants Crain (Co-Founder and then CEO) and Riggsbee (Co-Founder and Chief Product Officer).  During that meeting, Riggsbee demonstrated the capabilities of the Gadget software product.  Crain gave an overview of Gadget's market position and finances using various Power Point presentation slides.

18.     Following that session, Mr. Towne requested by email that Gadget provide a copy of the "Presentation Deck," the Power Point presentation of information regarding Gadget's software product shown to HTC during the video-conference call.  Towne also requested copies of "the financial materials from the [Series A] round asap, so we can review and move things forward."

19.     On October 4, 2017, Gadget forwarded to Mr. Towne at HTC a copy of the "Presentation Deck" used by Defendants during their October 2, 2017 video-conference.  A true and correct copy of the Presentation Deck is attached hereto as Exhibit A.

20.     Through these meetings and in the presentation materials, Defendants Crain and Riggsbee portrayed the product as fully tested and on the market.  Defendants Crain and Riggsbee further represented that the company had won contracts with major corporations including GE Aviation, Siemens, and the "Dummies" book series, and had numerous other prospects named as either "opportunities" or "in the pipeline." (See Exhibit A at pages 12 and 15).   The Presentation Deck showed images of Gadget's product in actual use with these customer names.  (See Exhibit A at page 20.)

21.     During their October 2, 2017 presentation to HTC, Defendants Crain and Riggsbee represented that Gadget was "first to market" with a "three-year head start" on its

competition, and that it offered the "only content platform in existence."  See Exhibit A at page 21.  These statements confirmed that the product was complete and being sold.

22.     In seeking to secure HTC's investment during the October 2, 2017 presentation to HTC, Defendants Crain and Riggsbee also outlined the specific needs that HTC's money would fulfill.  They specifically represented that HTC's investment would be used for sales and engineering.

23.     Gadget's Presentation Deck stated that future cash raised would be used 75% for sales and 25% for engineering.  This not only reiterated Crain's and Riggsbee's promise to use HTC's investment for sales and engineering, but also implied that most of the costs of engineering the product had already been incurred—further solidifying Gadget's promise that the product development was complete.  See Exhibit A at page 22.

24.     Gadget's Presentation Deck also advertised its prior success in raising capital, noting as of the October 2, 2017 presentation to HTC that it had raised $10 million and was targeting $20 million for the next financing round.  See Exhibit A at page 22.

25.     On information and belief, Soni (as Chairman of the Board and the individual responsible for soliciting HTC's investment) was aware that these representations were being made to HTC at the time and, indeed, assisted in the pitch.

26.     On October 4, 2017, Gadget's Chief Financial Officer also forwarded to Mr. Towne and others at HTC copies of the Series A closing documents which had been signed by the investors participating in the Series A round, including an Investors' Rights Agreement, Right of First Refusal and Co-Sale Agreement, Common Stock and Series A Preferred Stock Purchase Agreement, and Voting Agreement (hereinafter, "the Series A Closing Documents").

5210106v4

27. The Series A Closing Documents reflected that the Series A investors obtained their preferred and common stock positions in Gadget as of November 18, 2016.

28. The Closing Documents articulated unique benefits to holders of Series A Preferred Stock. For example, holders of Series A Preferred Stock were, "exclusively and as a separate class," "entitled to elect" a board director. Further, the agreements forbid any subsequent sale of stock "unless all holders of Series A Preferred Stock [were] allowed to participate in such transaction."

29. The Closing Documents also clarified that any subsequent holder of Series A Preferred Stock was required to sign and "become a party to" the original documents.

30. Specifically, the § 7.1(a) of the Voting Agreement stated:

> Notwithstanding anything to the contrary contained in this Agreement, if the Company issues additional shares of Series A Preferred Stock after the date of this Agreement, as a condition to the issuance of such shares the Company will require that any purchaser of shares of Series A Preferred Stock become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as Exhibit A, or (ii) a counterpart signature page to this Agreement agreeing to be bound by and subject to the terms of this Agreement as an Investor and Stockholder hereunder. In either event, each such person will thereafter be deemed an Investor and Stockholder for all purposes under this Agreement.

31. Similarly, § 6.9 of the Investor Rights Agreement stated:

> Notwithstanding anything to the contrary contained in this Agreement, if the Company issues additional shares of the Company's Series A Preferred Stock after the date of this Agreement, any purchaser of such shares of Series A Preferred Stock may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter will be deemed an "Investor" for all purposes hereunder. No action or consent by the Investors will be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

32.     Gadget filed a Form D with the SEC in connection with this initial sale of securities.  The Form D claimed an exemption under Rule 506(b), and recorded November 18, 2016, as the first sale date and December 5, 2016, as the accession date.

33.     Gadget represented on its Form D that this sale of securities raised $10,690,438.

34.     Based on the Individual Defendants' foregoing representations, HTC agreed to invest $570,000 Gadget.

35.     On December 21, 2017—more than thirteen months after Gadget's prior sale of securities to the other Series A investors—HTC tendered its wire transfer to Gadget in the amount of $570,000 in exchange for 2,749,639 shares of Series A Preferred stock and 2,749,639 shares of Common stock in Gadget.

36.     Later that day, Gadget issued Share Certificates in favor of HTC for those shares. (True and correct copies of the Share Certificates are attached hereto as Exhibit B.)

37.     Gadget never sent HTC any of the Series A Closing Documents to be executed by HTC. Therefore, HTC never became a party to any of the Series A Closing Documents.

38.     On information and belief, Gadget never sought or received the consent of the initial Series A investors to authorize the sale of further securities to HTC.

39.     Unlike other Series A investors, HTC was never offered the opportunity to appoint a member of Gadget's Board of Directors.

40.     Gadget never inquired regarding whether HTC was an accredited investor such that it would qualify to purchase the private offering exempt from registration as required under Section 506(c).

41.     Gadget never filed a Form D with the SEC associated with its sale of securities to HTC.

42.      After issuing Share Certificates to HTC, Gadget failed and refused to provide updated financial statements and Series A Closing Documents to HTC to .

43.      In an apparent effort to reassure HTC of the value of its investment, Defendant Crain provided HTC with an updated Presentation Deck by email dated February 1, 2018, approximately six weeks after HTC's shares were issued by Gadget.

44.      In that Presentation Deck, Gadget made more specific representations as to the customers it had "won," specifically naming Hella, Ingersoll Rand, PTC, Siemens, Wiley and Woodbridge Foam.  It also listed many others, including Air France/KLM, Applied Materials, Bayer, and Volkswagon, as "75%" "in the pipeline."

45.      Five months later, Crain sent an email to all investors, including HTC, to inform them that he was stepping down as CEO of Gadget effective immediately.  Crain's email further explained that Gadget was redirecting its sales focus from business-to-business markets in education and publishing to more revenue-driven content industries.  Crain's email promised improved revenues in 2018.

46.      Although Crain stepped down as CEO, he reportedly remained on Gadget's Board of Directors.  Co-Founder and Chairman of the Board, Defendant Soni, assumed the position of CEO.

47.      Like Crain before him, Soni failed and refused to provide HTC with financial statements and other information concerning HTC's investment, including signed Series A Closing Documents or updates regarding how HTC's funds were being used by Gadget.

48.      On March 14, 2019, Soni solicited additional investments from HTC and its other original Series A investors.  Gadget required these original investors to provide additional cash as part of a bridge loan, in contributions proportionate to their original investments, explaining

that unless HTC invested an additional $45,929.20, "all [of its] previous investment [would] be converted to common stock."

49.     This demand by Gadget was not supported by any contractual obligation since HTC never became a party to the Series A Closing Documents.

50.     HTC's John McInerney visited Gadget's offices in Newark, NJ on May 14, 2019 to learn more about the product and offer suggestions for marketing.  At that time, Mr. McInerney discovered what he related to Soni as extremely poor sales and marketing efforts.

51.     Shortly thereafter, Soni admitted to Mr. Towne that Gadget's representations made regarding the success of the product prior to HTC's investment were patently false, as enumerated herein.

52.     Soni admitted that Gadget had never secured customer relationships with GE Aviation, Siemens, the "Dummies" book series, or any of the customers identified in either of the Presentation Decks upon which HTC relied in making its investment.  In fact, none of these entities were customers.

53.     Soni further admitted that Gadget was never "75%" of the way to securing further customer contracts with Air France/KLM, Applied Materials, Bayer, Volkswagon, or any of the other companies identified on its second Presentation Deck.

54.     HTC discovered that Gadget's stock valuation had not increased as it should have; instead, Gadget has been unable to attach any value to the HTC's shares.

55.     Gadget never intended to use HTC's investment for sales and engineering. Instead, HTC discovered that Gadget used HTC's money to pay outstanding payroll tax liabilities incurred in 2018, prior to HTC's investment. Indeed, none of HTC's cash went to fund sales or engineering of the software product.

56.     HTC discovered that Gadget had not raised $10 million in its first round of investing.  In fact, Gadget had raised only $8 million.

57.     HTC discovered that Gadget's profit and loss statement for the calendar year 2018 showed that Gadget earned no ordinary income, despite representing to HTC in 2017 that its products were on the market with active sales.

58.     None of the Individual Defendants ever endeavored to correct or clarify the false and/or misleading statements made to HTC beforehand.

59.     Having discovered its investment rested on a series of untruths, HTC demanded the return of its investment, but was informed that Gadget did not have the cash or obligation to redeem HTC's shares.

60.     Gadget's representations of fact as alleged above were materially false and/or misleading.

61.     HTC relied to its detriment on the aforementioned misrepresentations made by Defendants Soni, Crain, and Riggsbee when placing its investment.

62.     Defendants Soni, Crain, and Riggsbee, individually and on behalf of Gadget, knew that their representations of fact as alleged above were false and/or misleading and that HTC would rely upon them in making its investment.

63.     If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because they were not, however, the securities are essentially worthless.

64.     As a result of its detrimental reliance upon the Individual Defendants' false and/or misleading statements of fact, HTC has been damaged in the amount of $570,000.

5210106v4

65.     HTC has been further damaged by the loss of use of its funds for 40 months as of the date of the filing this complaint, and accordingly, it is entitled to interest on its investment.

66.     Defendants' fraudulent conduct was willful and egregious, thereby entitling HTC to an award of punitive damages.

### COUNT I
### Violation of Section 10b of the Securities Exchange Act of 1934
### v. All Defendants

67.     HTC incorporates by reference the allegations set forth in paragraphs 1 through 66 above as if set forth at length herein.

68.     Under Section 10(b) of the Exchange Act, it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

69.     Under rules that the SEC promulgated to implement the Exchange Act, it is illegal for a person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

70.     Defendants' offer and sale of stock to HTC is subject to the anti-fraud requirements of Rule 10b-5.

71.     Defendants violated Rule 10b-5 by selling securities to HTC based on misrepresentations and omissions of material fact, including the following:

       a.     That the product was "first to market" with a "three-year head start" on its competition and that it offered the "only content platform in existence."

- 12 -

In fact, the product was not complete, on the market, or in production. Gadget's profit and loss statement for the calendar year 2018 confirms that Gadget earned no ordinary income, despite representing to HTC in 2017 that its products were on the market with active sales.

b.  That Gadget had secured customer relationships with GE Aviation, Siemens, and the "Dummies" books series.  In fact, Gadget had no such customer relationships prior to the offering to HTC.

c.  That Gadget was close to securing contracts with Air France/KLM, Applied Materials, Bayer, Volkswagon and other companies.  In fact, Gadget was never close to securing any contracts with any of the identified companies.

d.  That HTC's investment would be used for sales and engineering.  Instead, Gadget used HTC's money to pay outstanding payroll tax liabilities incurred in 2017. None of HTC's cash went to sales or engineering of the software product.

e.  That Gadget had raised $10 million in support of the software.  In fact, it had raised only $8 million.

72.  These inaccurate, incomplete, and/or misleading prior disclosures required the Defendants to make a corrective statement, but none did.

73.  HTC relied on these statements—whether misrepresented or concealed—when making its decision to invest in Gadget.  Indeed, HTC's misrepresentations and material omissions were the primary basis for HTC's decision to invest in Gadget.

74.     The facts that Defendants misrepresented and omitted would have been important to reasonable investors making investment decisions.

75.     All of the foregoing misstatements and omissions concern central matters of Gadget's business and future prospects.  On information and belief, since the Individual Defendants are all high-ranking financial officers within Gadget, they were privy to confidential information concerning Gadget's finances, business, operations, performance, current position, and future prospects.  Accordingly, when Individual Defendants made those false statements and omissions, they either knew that the facts as misrepresented or concealed were false or misleading, or were reckless with respect to whether such facts were misleading.

76.     Indeed, Defendants—as Soni later admitted—lied to HTC in order to induce the company to invest in Gadget's securities.

77.     HTC, as a direct and proximate result of Defendants' wrongdoing, purchased stock worth significantly less than what it paid.

78.     If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because they were not, however, the securities are essentially worthless.

WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against All Defendants on Count I.

## COUNT II
### Violation of Section 20(a) of the Securities Exchange Act
### v. Defendants Soni, Craig, and Riggsbee

79.     HTC incorporates by reference the allegations set forth in paragraphs 1 through 78 above as if set forth at length herein.

5210106v4

80.     Section 20(a) of the Exchange Act extends liability to individuals "who, directly or indirectly, control[] any person liable" under Section 10b-5.  15 U.S.C. § 78t(a). Implementing regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

81.      Each of the Individual Defendants was a controlling person of Gadget within the meaning of Section 20(a) of the Exchange Act at the time of wrongdoing.  Specifically, Robert Soni is a co-founder and served as Chairman of the Board during the company's initial fraudulent acts—a role which, on information and belief, he retains.  Further, Soni currently serves as CEO and Executive Chairman of the Board of Gadget.  Dan Crain is a co-founder and past CEO of Gadget.  And Maxwell Riggsbee is also co-founder and the current Chief Product Officer of Gadget.

82.     In their respective high-level capacities, each of the Individual Defendants participated in Gadget's management and were involved in Gadget's day-to-day operations from positions of high authority.  On information and belief and by virtue of their positions, each had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.      As alleged herein, each of the Individual Defendants actively participated and collaborated in the sale of securities at issue in the case, and actively participated in inducing HTC to invest in the company.

84.     On information and belief, as high-level executives of Gadget, each of the Individual Defendants was privy to, and had regular access to, Gadget's confidential and

proprietary information, its business, operations, financial statements, performance, financial condition, growth, and future prospects.

85.     As such, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, Gadget's decision-making, including the content and dissemination of the false statements that induced HTC to invest $570,000 into the company.

86.     Upon information and belief, each of the Individual Defendants, because of his position of control and authority as an executive officer of Gadget, had access to the adverse undisclosed information alleged herein concerning Gadget's business, operations, and financial statements, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Gadget materially false or misleading.

87.     By virtue of their positions as controlling persons of Gadget, each of the Individual Defendants—to the extent they are not primarily liable for the aforementioned fraudulent misrepresentations and omissions—is liable to the plaintiff pursuant to Section 20(a) of the Exchange Act, jointly and severally with Gadget.

88.     WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against All Individual Defendants on Count II.

## COUNT III
### Pennsylvania Securities Law Violation
### <u>v. All Defendants</u>

89.     HTC incorporates by reference the allegations set forth in paragraphs 1 through 88 above as if set forth at length herein.

90.     Like Rule 10b-5, the Pennsylvania Securities Act ("PSA") prohibits false statements and omissions of material fact in connection with the sale of securities in Pennsylvania.  70 Pa. C. S. §§ 1-401(a), 501(a).

91.     By offering and selling securities to HTC in Pennsylvania, Defendants are subject to the anti-fraud requirements of the PSA.

92.     Defendants violated the anti-fraud provisions of the PSA by making the false statements and omissions set forth above.

93.     HTC relied on these statements—whether misrepresented or omitted—when making its decision to invest in Gadget.  Indeed,  Defendants' misrepresentations and material omissions were the primary basis for HTC's decision to invest in Gadget.

94.     The facts that Defendants misrepresented and omitted would have been important to reasonable investors making investment decisions.

95.     When making those false statements and omissions, Defendants either knew that the facts as misrepresented or concealed were false or misleading, or were reckless with respect to whether such facts were misleading.

96.     The inaccurate, incomplete, and/or misleading prior disclosures required the Defendants to make a corrective statement, but none did.

97.     Indeed, Defendants—as Soni later admitted—lied to HTC in order to induce the company to invest in Gadget's securities.

98.     HTC, as a direct and proximate result of Defendants' wrongdoing, purchased stock worth significantly less than what it paid.

99.     HTC, as a direct and proximate result of Defendants' wrongdoing, purchased stock worth significantly less than what they paid.

- 17 -

100.    If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because Gadget was not as represented, however, the securities are essentially worthless.

WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against All Defendants on Count III.

## COUNT IV
## Common Law Fraud
## v. All Defendants

101.    HTC incorporates by reference the allegations set forth in paragraphs 1 through 100 above as if set forth at length herein.

102.    "[T]he traditional elements of common law fraud under Pennsylvania law are (1) misrepresentation of a material fact, (2) scienter, (3) intent to induce action, (4) justifiable reliance, and (5) damage as a proximate result."  *Scott v. Fred Beans Chevrolet of Limerick, Inc.*, 183 F. Supp. 3d 691, 699 (E.D. Pa. 2016).

103.    In selling the securities to HTC, the Individual Defendants, both individually and in their capacities as agents and authorized representatives of Gadget, made false and misleading statements and material omissions set forth above.

104.    HTC relied on these statements—whether misrepresented or concealed—when making its decision to invest in Gadget.  Indeed, the Defendants' misrepresentations and material omissions were the primary basis for HTC's decision to invest in Gadget.

105.    The facts that the Defendants misrepresented and omitted would have been important to reasonable investors making investment decisions.

5210106v4

106.    When making those false statements and omissions, the Defendants either knew that the facts as misrepresented or concealed were false or misleading or were reckless with respect to whether such facts were misleading.

107.    As Soni later admitted, Defendants lied to HTC in order to induce the company to invest in Gadget's securities.

108.    The Defendants misrepresented and omitted facts intending to induce HTC to act on their misrepresentations by investing in Gadget.

109.    As a direct and proximate result of the Defendants' wrongdoing, HTC purchased stock worth significantly less than what it paid.

110.    If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because Gadget was not as represented, however, the securities are essentially worthless.

111.    The Defendants' conduct in perpetrating this fraud was malicious, wanton, reckless, willful, and/or oppressive such that punitive damages are appropriate.

WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against All Defendants on Count IV.

## COUNT V
### Negligent Misrepresentation
### v. All Defendants

112.    HTC incorporates by reference the allegations set forth in paragraphs 1 through 111 above as if set forth at length herein.

113.    The elements of a claim for negligent misrepresentation under Pennsylvania law are (a) misrepresentation of a material fact, (b) made under circumstances in which the one engaging in the misrepresentation ought to have known of its falsity; (c) with an intent to induce

another to act on it; (d) which results in injury to the party acting in justifiable reliance on the misrepresentation.  *ASTech Int'l, LLC v. Husick*, 676 F. Supp. 2d 389, 399 (E.D. Pa. 2009).

114.    This Count does not sound in fraud.  All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

115.    Whereas fraud requires proof of knowing or reckless communication of false information, negligent misrepresentation incorporates misrepresentations made with a lack of reasonable care.

116.    The Individual Defendants, both individually and in their capacities as agents and authorized representatives of Gadget, owed HTC the duty to make a reasonable and diligent investigation of the statements made in their oral and written communications to HTC to ensure that such statements were true and that they did not omit material facts necessary to make the communications not misleading.

117.    In selling the securities to the HTC, the Defendants made the false and misleading statements and material omissions set forth above.

118.    All of the facts that were misrepresented or concealed were material to the HTC's investment decisions.

119.    All of the facts that were misrepresented or concealed would have been important to a reasonable investor in making his or her investment decision.

120.    If and to the extent the misrepresentations or omissions set forth above were not made knowingly or recklessly, they were made negligently.  In other words, at the very least they were made with a lack of reasonable care.

121.    In making the misrepresentations set forth above, the Defendants knew or ought to have known of their falsity.

122.   The Defendants misrepresented and omitted facts intending to induce HTC to act on their misrepresentations by investing in Gadget.

123.   HTC acted in justifiable reliance on the Defendants' misrepresentations, purchasing Gadget's stock.

124.   HTC suffered injury as a result of its reliance on the Defendants' misrepresentations, having purchased stock worth much less than it was valued.

125.   If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because Gadget was not as represented, however, the securities are essentially worthless.

WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against All Defendants on Count V.

## COUNT VI
### Breach of Contract
### v. Defendant Gadget Software, Inc.

126.   HTC incorporates by reference the allegations set forth in paragraphs 1 through 125 above as if set forth at length herein.

127.   Under Pennsylvania law, the elements for breach of contract are "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damage." *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 399 (E.D. Pa. 2009).

128.   HTC paid Gadget the sum of $570,000 as consideration for its shares of Series A preferred and common stock in a company which Defendants represented had existing contracts with GE Aviation, Siemens and the Dummies book series and other household names in its "pipeline," was "first to market" and had a "three year head-start" on its competition, and had raised $10,000,000 in its first round of financing.  Defendants also represented that the preferred

stock HTC purchased would be entitled to the same rights as other preferred stockholders. This constitutes the basis for HTC's enforceable contract.

129.    Gadget breached that contract by misrepresenting the essential facts upon which the bargain was based: none of these representations concerning the value of the company was true.  As a result of Gadget's misrepresentations, HTC purchased an ownership interest in a company than was entirely different from what it was promised.

130.    HTC has also not been afforded the same rights as the prior Series A preferred stockholders.  For example, it has never been authorized to vote on Gadget's Board membership.

131.    Because of Gadget's failure to deliver on its promises, HTC drastically overpaid for its Gadget stocks, and did not receive the promised benefit of its contracted bargain.

132.    If Gadget and its product had been as represented, the securities would have been worth substantially more.  Because Gadget was not as represented, however, the securities are essentially worthless and HTC has suffered damages in the amount of $570,000 plus interest from the date of its investment.

WHEREFORE, HTC respectfully requests that the Court enter judgment in its favor and against Defendant Gadget Software, Inc. on Count VI.

### JURY TRIAL DEMAND

HTC hereby demands a trial by jury on all issues so triable.

**WHEREFORE**, HTC respectfully requests that this Court enter judgment in its favor on each and all of the above counts against Gadget and the Individual Defendants and award the following relief:

5210106v4

a)  An order rescinding HTC's investment agreement with Gadget and requiring

Gadget and/or the Individual Defendants personally to repay HTC's $570,000

investment plus statutory interest since December 21, 2017;

b)  compensatory damages including attorneys' fees and costs as provided by statute;

c)  punitive damages based upon Defendants' fraudulent conduct; and

d)  such other relief as the Court may deem appropriate under the circumstances.

DATED:  April 20, 2020

/s/ Stephen G. Rhoads
Stephen G. Rhoads (PA Bar No. 47458)
Robert Day (PA Bar No. 321298)
MONTGOMERY, McCRACKEN,
   WALKER & RHOADS, LLP
1235 Westlakes Drive, Suite 200
Berwyn, PA  19312
Telephone:  (610) 889-2244
Email:  srhoads@mmwr.com
           rday@mmwr.com

Attorneys for Plaintiff
Hobbs & Towne Capital III, LLC